IN THE UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

**DENNIS SIGMAN**,                                                  Civil Case No. 3:10-968-KI

                    Plaintiff,

                                                                  OPINION AND ORDER

        vs.

**MICHAEL J. ASTRUE,**
Commissioner of Social Security,

                    Defendant.


        Merrill Schneider
        Schneider Law Offices
        P.O. Box 14490
        Portland, Oregon 97293

                Attorneys for Plaintiff

        Dwight C. Holton
        United States Attorney
        District of Oregon
        Adrian L. Brown


PAGE 1 - OPINION AND ORDER

Assistant United States Attorney
1000 SW Third Avenue, Suite 600
Portland, Oregon  97204-2902

Kathryn A. Miller
Special Assistant United States Attorney
Social Security Administration
701 5th Avenue, Suite 2900 M/S 221A
Seattle, Washington  98104-7075

       Attorneys for Defendant

KING, Judge:

Plaintiff Dennis Sigman brings this action pursuant to section 205(g) of the Social

Security Act, as amended, 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the

Commissioner denying plaintiff's application for disability insurance benefits ("DIB") and

supplemental security income benefits ("SSI").  I reverse and remand the decision of the

Commissioner.

## BACKGROUND

Sigman filed applications for DIB and SSI on November 6, 2006, alleging disability

beginning March 21, 2002.  The applications were denied initially and upon reconsideration.

After a timely request for a hearing, Sigman, represented by counsel, appeared and testified

before an Administrative Law Judge ("ALJ") on August 13, 2009.

On September 22, 2009, the ALJ issued a decision finding that Sigman was not disabled

within the meaning of the Act and therefore not entitled to benefits.  This decision became the

final decision of the Commissioner when the Appeals Council declined to review the decision of

the ALJ on July 1, 2010.

PAGE 2 - OPINION AND ORDER

## DISABILITY ANALYSIS

The Social Security Act (the "Act") provides for payment of disability insurance benefits to people who have contributed to the Social Security program and who suffer from a physical or mental disability.  42 U.S.C. § 423(a)(1).  In addition, under the Act, supplemental security income benefits may be available to individuals who are age 65 or over, blind, or disabled, but who do not have insured status under the Act.  42 U.S.C. § 1382(a).

The claimant must demonstrate an inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to cause death or to last for a continuous period of at least twelve months.  42 U.S.C. §§ 423(d)(1)(A) and 1382c(a)(3)(A).  An individual will be determined to be disabled only if his physical or mental impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy.  42 U.S.C. §§ 423(d)(2)(A) and 1382c(a)(3)(B).

The Commissioner has established a five-step sequential evaluation process for determining if a person is eligible for either DIB or SSI due to disability.  The evaluation is carried out by the ALJ.  The claimant has the burden of proof on the first four steps.  Parra v. Astrue, 481 F.3d 742, 746 (9th Cir. 2007), cert. denied, 128 S. Ct. 1068 (2008); 20 C.F.R. §§ 404.1520 and 416.920.  First, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  If the claimant is engaged in such activity, disability benefits are denied.  Otherwise, the ALJ proceeds to step two and determines whether the claimant has a medically severe impairment or combination of impairments.  A severe impairment is one "which

PAGE 3 - OPINION AND ORDER

significantly limits [the claimant's] physical or mental ability to do basic work activities."  20

C.F.R. §§ 404.1520(c) and 416.920(c).  If the claimant does not have a severe impairment or

combination of impairments, disability benefits are denied.

      If the impairment is severe, the ALJ proceeds to the third step to determine whether the

impairment is equivalent to one of a number of listed impairments that the Commissioner

acknowledges are so severe as to preclude substantial gainful activity.  20 C.F.R. §§ 404.1520(d)

and 416.920(d).  If the impairment meets or equals one of the listed impairments, the claimant is

conclusively presumed to be disabled.  If the impairment is not one that is presumed to be

disabling, the ALJ proceeds to the fourth step to determine whether the impairment prevents the

claimant from performing work which the claimant performed in the past.  If the claimant is able

to perform work she performed in the past, a finding of "not disabled" is made and disability

benefits are denied.  20 C.F.R. §§ 404.1520(e) and 416.920(e).

      If the claimant is unable to perform work performed in the past, the ALJ proceeds to the

fifth and final step to determine if the claimant can perform other work in the national economy

in light of his age, education, and work experience.  The burden shifts to the Commissioner to

show what gainful work activities are within the claimant's capabilities.  Parra, 481 F.3d at 746.

The claimant is entitled to disability benefits only if he is not able to perform other work.  20

C.F.R. §§ 404.1520(f) and 416.920(f).

## STANDARD OF REVIEW

      The court must affirm a denial of benefits if the denial is supported by substantial

evidence and is based on correct legal standards.  Bayliss v. Barnhart, 427 F.3d 1211, 1214 n.1

(9th Cir. 2005).  Substantial evidence is more than a "mere scintilla" of the evidence but less than

a preponderance.  Id.  "[T]he Commissioner's findings are upheld if supported by inferences reasonably drawn from the record, and if evidence exists to support more than one rational interpretation, we must defer to the Commissioner's decision."  Batson v. Comm'r of Soc. Sec. Admin., 359 F.3d 1190, 1193 (9th Cir. 2004) (internal citations omitted).

## THE ALJ'S DECISION

The ALJ found Sigman suffered from the severe impairment of personality disorder, not otherwise specified, and the non-severe impairment of mild depressive disorder.  The ALJ concluded that Sigman's complaints of (1) alcohol and methamphetamine abuse, in remission; (2) history of seizure disorder, remote; and (3) right hip degenerative changes were not medically determinable impairments.  The ALJ also found that the personality disorder was not severe enough to meet or medically equal the requirements of any of the impairments listed in 20 C.F.R. § 404, Subpart P, Appendix 1.  Sigman could perform a full range of work at all exertional levels, but could not work in a tandem or team and could not have contact with the general public.  Despite these nonexertional limitations, the ALJ consulted the Medical-Vocational Guidelines and concluded that the nonextertional limitations would have "little or no effect on the occupational base of unskilled work at all exertional levels."  Tr. 40.  As a result, the ALJ found Sigman not disabled.

## FACTS

Sigman, 42 years old at the time of his alleged onset date of disability, received a GED and worked until 2002.  He changed jobs every few months and had worked for approximately 50 employers by then, ranging from construction to telemarketing.  He explained at the hearing that he had trouble keeping a job because he had "a hard time getting along with people, taking

orders" and that, for the telemarketing jobs, his sales figures were too low.  Tr. 11.  He admitted, however, that "a lot of it had to do with the fact that I was drinking a lot . . . . My priorities weren't in order.  I was doing a lot of drinking, I was doing drugs and that's the main reason I believe as to why I never kept a job very long."  Tr. 16.  Sigman had been homeless for a time, but as of the hearing he had been living in government housing for the past two and a half years.  He had traveled to Louisiana to perform construction work in 2006 after Hurricane Katrina.

Sigman complained of pain in his right hip from arthritis, tendinitis in his left wrist, and seizures.  He used a cane to help him walk, but could walk five or six blocks.  He thought he could stand four out of eight hours with breaks.  He had no trouble sitting.  He thought he could lift 25 to 30 pounds at a time, and ten pounds two-thirds of the day.  He thought he could use his hands all day long.  He complained of having trouble concentrating, such as thinking about other things while he was working, but testified he had no trouble concentrating while performing the telemarketing work.  He agreed he had no big problems with his memory.  He testified he had experienced 20 to 25 grand mal seizures in the last couple of years and he estimated he had two to three small seizures a week.

On October 16, 2006, Psychiatric Mental Health Nurse Practitioner Cox at Multnomah County Health Department diagnosed Sigman with depressive disorder, in partial remission, and antisocial personality disorder.  He was treated with Prozac and was sleeping well.

In November of 2006, he sought care at the OHSU emergency department for facial lacerations and a black eye he sustained after an altercation.  He was clinically intoxicated and was slurring his speech when he arrived at the emergency department.  In February of 2007, he had a coughing fit in the middle of the night in his kitchen and passed out.  He hit his nose and

PAGE 6 - OPINION AND ORDER

mouth on the floor.  His alcohol level was negative.  He was diagnosed with syncope, a loss of

consciousness as a result of insufficient blood flow to the brain.  <u>See</u> www.merriam-

webster.com/medlineplus/syncope (last visited June 14, 2011).

As a result of the syncope, T. Engstrom, M.D., prescribed Dilantin given Sigman's

reports of a history of seizures from the age of 13.  Sigman continued to receive treatment and

counseling for depression at the Multnomah County Health Department.  He was diagnosed with

depressive disorder, in remission and stable, and methamphetamine dependence in remission in

March 2007.

Sigman sought treatment at the OHSU emergency department again at the end of March

2007 as a result of back pain he sustained after lifting televisions.  He was given a prescription

for Vicodin and discharged in good condition.  An x-ray showed mild arthritic changes in his hip

joints and a CT scan showed mild degenerative changes in his cervical spine.

In August of 2007, M. John Givi, Ph.D., Psy.D., completed an evaluation of Sigman.

Sigman reported to Dr. Givi that he spent his time watching television, visiting other tenants in

his building, playing cards and doing puzzles.  He prepared five small meals a day and he went

grocery shopping with a neighbor once a month.  He tested in the low average range for

intellectual ability.  Testing showed Sigman's working memory was in the average range–he

performed better than 70% of people his age.  He also showed "strong performance in

manipulating and reordering digits[.]"  Tr. 314.  Dr. Givi opined that Sigman "appears to be

independent in his activities of daily living and his condition is not severe enough to prevent him

from seeking employment."  <u>Id.</u>  Dr. Givi did note, however, that Sigman's complaints appeared

to be physical, which was beyond the scope of the assessment.  Dr. Givi diagnosed Sigman with

PAGE 7 - OPINION AND ORDER

Major Depressive Disorder, recurrent and mild, and under control with medication.  He assigned a GAF of 62.[1]

In September of 2007, James Thayer, M.D., reported Sigman's joint pain in his pelvis, without discussion, and diagnosed a cane.  In May 2008, Sigman reported for follow-up to Dr. Thayer after being treated at Good Samaritan Hospital for alcoholic pancreatitis; this was the fourth time he had been treated for this problem.  Sigman reported to Dr. Thayer in September of 2008 that he had not used meth for two years and had not drunk alcohol for several months.  In November 2008, Sigman told Dr. Thayer that he was worried about his health and had stopped drinking alcohol and smoking cigarettes.  He reported, however, that he had done meth the day before.

At the time of hearing, Sigman testified he was not drinking a lot and was not doing drugs at all.

## DISCUSSION

Sigman challenges the ALJ's severity analysis, points out the ALJ's error in failing to address lay witness statements, identifies problems with the ALJ's residual functional capacity analysis, and questions the ALJ's use of the Medical-Vocational Guidelines in his step five evaluation.

///

---

[1]The GAF is a scale from 1-100, in ten point increments, that is used by clinicians to determine the individual's overall functioning. A GAF of 61 to 70 means "**Some mild symptoms** (e.g., depressed mood and mild insomnia **OR some difficulty in social, occupational, or school functioning** (e.g., occasional truancy, or theft within the household), **but generally functioning pretty well, has some meaningful interpersonal relationships.**"  The American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders 34 (4th ed. 2000) ("DSM-IV").

I.    <u>Severity Analysis</u>

Sigman argues that the ALJ erred by opining that Sigman has a personality disorder when the only support for this diagnosis comes from a nurse practitioner, who is not an acceptable medical source.  Instead, Sigman believes the medical evidence supports the severe impairments of depression and polysubstance abuse.  Additionally, Sigman contends the ALJ erred by concluding Sigman's seizure disorder and polysubstance abuse problem were not medically determinable impairments.

A medically determinable impairment must be established through signs, symptoms, and medically acceptable clinical or laboratory findings but under no circumstances can be established through symptoms, namely the individual's own perception of the impact of the impairment, alone.  <u>Ukolov v. Barnhart</u>, 420 F.3d 1002, 1005 (9th Cir. 2005) (citing SSR 96-4p). An impairment is "medically severe" if it "significantly limits [a claimant's] physical or mental ability to do basic work activities."  20 C.F.R. §§ 404.1520(c); 416.920(c).

The Commissioner agrees that very little in the record supports the ALJ's determination that Sigman suffers from the severe impairment of personality disorder.  However, in the Commissioner's view, and in my view, any error is harmless.  The ALJ relied on evidence from the psychiatric mental health nurse practitioner, resolved step two in Sigman's favor, and gave Sigman the benefit of the doubt.  Additionally, Sigman does not identify any limitations or restrictions associated with a diagnosis of depression or polysubstance abuse that were not already captured by the ALJ at step five, nor does Sigman argue that his depression or polysubstance abuse impairments meet or equal the listings.  The ALJ's finding, if in error, is harmless.

PAGE 9 - OPINION AND ORDER

The ALJ's conclusion that Sigman's depression, although medically determinable, was not severe is supported by the record.  Treating providers repeatedly described Sigman's condition as "slightly depressed," in "partial remission," "under control with medication," "mild," and "not severe."  Tr. 217, 315, 314.

Finally, the ALJ found Sigman's remote seizure disorder and substance abuse issues were not medically determinable impairments.  Although consulting physician Peter LeBray, Ph.D., opined that Sigman had the medically determinable impairment of polysubstance abuse, alcohol and methamphetamine, he noted that the condition was in remission.  Sigman points to no other medical evidence supporting his assertion that the ALJ erred.

As for the seizure disorder, the evidence reflects that Sigman reported experiencing multiple seizures a week, but there is very little medical support for this assertion.  He visited the ER on one occasion in February of 2007, and he was diagnosed with syncope.  It was only after that incident that Dr. Engstrom learned about his history of seizures and prescribed Dilantin.  Although Sigman testified that he had multiple emergency room visits for seizures, this incident was the only one in the record.  Once the medication was prescribed, Dr. Engstrom reported being "suspicious" that Sigman was in compliance with his medication.  Tr. 360.  Dr. Engstrom also questioned whether Sigman was really suffering from seizures.  Tr. 359.  Again, Sigman points to no medical evidence supporting his assertion that the ALJ erred.

In sum, substantial evidence supports the ALJ's conclusion regarding Sigman's alleged impairments.

II.    Lay Witnesses

The ALJ neglected to mention and discuss the third-party function reports submitted by

Sigman's friends, Billy Robbins and Donald Saben.

Lay testimony about a claimant's symptoms is competent evidence which the ALJ must take into account unless he gives reasons for the rejection that are germane to each witness. Stout v. Commissioner of Soc. Sec. Admin., 454 F.3d 1050, 1053 (9th Cir. 2006).  "[W]here the ALJ's error lies in a failure to properly discuss competent lay testimony favorable to the claimant, a reviewing court cannot consider the error harmless unless it can confidently conclude that no reasonable ALJ, when fully crediting the testimony, could have reached a different disability determination." Id. at 1056.

Robbins wrote that they had been friends for five years, that they saw each other every day and usually had lunch together.  Robbins reported on the one hand that Sigman had troubles concentrating and focusing and later that he "sometimes" had a difficult time concentrating and focusing on handling money.  Tr. 121.  He also had trouble sleeping and needed to be reminded to take his medications.  He needed no help performing household chores and yard work, but he "sometimes" needed to be reminded to do the tasks.  Sigman went outside on a daily basis, shopped for a couple of hours, and was able to pay bills, count change, and handle his bank accounts.  He could walk two blocks without stopping for a rest, and could follow written instructions.  He got along "well" with authority figures, but "panic[ed] when things [didn't] go right." Tr. 123.  Robbins also indicated, without explanation, that Sigman had trouble with lifting, squatting, bending, standing, walking, hearing, stair climbing, memory, completing tasks, concentration, understanding, and following instructions.

Sigman's friend Saben wrote that they saw each other daily when they sat and watched television together.  Saben reported that Sigman used to be able to lift a lot of weight, but was

unable to do that now.  Sigman also needed to be reminded to take his medications.  Sigman

prepared his own meals daily, was able to take out the garbage, but had a hard time mopping his

floor.  Saben also reported that Sigman went outside daily, used public transportation, shopped

for food two times a month, and had no trouble paying bills, counting change, and handling his

bank accounts.  He went to the library twice a month.  Saben opined that Sigman could carry ten

to 15 pounds, but standing, squatting, bending, and kneeling hurt his legs.  Sigman could walk

two blocks and then would need to rest for ten minutes, and Sigman used a cane.  Saben thought

Sigman followed written instructions well but not spoken instructions.  Saben reported seeing

Sigman have two seizures, where Sigman started shaking, slurred his speech, and then his body

convulsed.

The Commissioner argues that when fully crediting Robbins' statement, I can confidently

conclude that the ALJ's opinion would not have been different.  Robbins' observed only that

Sigman "sometimes" has difficulty concentrating and focusing (contradicting her earlier report

that Sigman has difficulty concentrating and focusing), but that Sigman had no trouble caring for

himself, performing chores or yard work, going outside, or using public transportation.

According to the Commissioner, this is consistent with the ALJ's conclusion that Sigman is

capable of performing work at all exertional levels.  With respect to Robbins' report that Sigman

had trouble sleeping, remembering or concentrating, the Commissioner contends Sigman does

not explain how such limitations affect his ability to work.

As for Saben's third-party report, the Commissioner again argues that Sigman fails to

explain how his remote seizure history affected his ability to work.  The Commissioner also

details how Saben's report is internally inconsistent–describing Sigman's need for reminders to

take his medications, while at the same time noting Sigman had no trouble taking his prescribed medications.  Additionally, Saben reports Sigman's need for a cane, but described an active person who took out the garbage, went outside everyday, used public transportation and traveled to the library.

As the Commissioner rightly notes, the third-party reports are internally inconsistent in many ways.  For example, Robbins opined that Sigman could follow written instructions, while at the same time marking the box indicating Sigman had trouble following instructions.  Saben similarly reported that Sigman needed to be reminded to take medications, but then marked "no" in response to a question about whether Sigman had difficulty taking prescribed medications for his seizures.  Internal inconsistencies is a reason sufficient to support a finding of harmless error. See Lockwood v. Comm'r, 397 F. App'x 288, 291 (9th Cir. Aug. 16, 2010) (lay witness statement not mentioned, but internally inconsistent so harmless error).

On the other hand, these inconsistencies are not particularly relevant to any conclusion about Sigman's functional limitations.  What is important is that both witnesses indicated that Sigman could walk only two blocks before needing to rest.  Such a report is not necessarily inconsistent with other observations about Sigman's ability to travel on public transportation, to do yard and housework, or to go outside everyday.  Saben also believed that Sigman could only lift ten to 15 pounds.  The ALJ here relied on section 204.00 of the Medical-Vocational Guidelines in finding Sigman not disabled.  That section covers claimants who are able to perform heavy work, which incorporates medium, light and sedentary work.  Medium work requires lifting no more than 50 pounds at a time and light work requires lifting no more than 20 pounds at a time.  SSR 83-10.  Both light and medium work require the individual to stand or

PAGE 13 - OPINION AND ORDER

walk most of the time.  SSR 83-14.  Crediting Robbins and Saben's third-party reports about

Sigman's lifting and walking limitations would undermine the ALJ's conclusion that Sigman can

perform the full-range of exertional work.  As a result, I cannot find that the ALJ's failure to

discuss these third-party reports was harmless.

III.    Sigman's Residual Functional Capacity

        Sigman asserts the ALJ's assessment of his residual functional capacity ("RFC") is

incomplete in that the ALJ did not include Sigman's need for a cane, Sigman's fifth grade

reading level, or his low average intellectual functioning.

        The RFC "is an assessment of an individual's ability to do sustained work-related

physical and mental activities in a work setting on a regular and continuing basis," meaning eight

hours a day, five days a week, or the equivalent.  SSR 96-8p.  The RFC is the most a person can

do in spite of limitations or restrictions.  Id.  "The RFC assessment must include a discussion of

why reported symptom-related functional limitations and restrictions can or cannot reasonably be

accepted as consistent with the medical and other evidence."  Id.

        With respect to Sigman's need to use a cane, the ALJ found his complaints about right

hip pain not entirely credible.  The medical evidence reflected only very mild right hip

degenerative joint disease.  In addition, Sigman reported moving televisions and building homes

in New Orleans.  Sigman did not challenge either the ALJ's conclusion that degenerative changes

in his right hip were not a medically determinable impairment or the ALJ's conclusion that

Sigman's assertions of right hip pain were not entirely credible.  He argues that Dr. Thayer

prescribed a cane for him, that Dr. Givi noted the need for the cane, and that Saben reported

Sigman's use of a cane.  Although Dr. Thayer prescribed a cane for Sigman, his notes do not

contain complaints from Sigman about hip pain nor do they include any testing supporting

Sigman's need for such assistance.  An ALJ is not required to incorporate limitations that are not

supported by substantial evidence.  Osenbrock v. Apfel, 240 F.3d 1157, 1164-65 (9th Cir. 2001).

As for the mental limitations, Sigman points out that the ALJ purportedly accepted Dr.

Givi's test results placing Sigman at a fifth grade reading level with a low average intelligence

level, but failed to include these limitations in the RFC.  The Commissioner does not respond to

this argument.  Since Sigman's documented reading problems and low average intelligence are

supported by substantial evidence in the record, the ALJ erred by failing to include in his RFC a

functional limitation that captured these impairments.  I address below whether such a failure is

harmless or not.

IV.    Medical-Vocational Guidelines

Finally, Sigman argues that the ALJ erred by failing to call on a vocational expert ("VE")

to determine what work, if any, he could perform.  In step five, the Commissioner bears the

burden to show that the claimant can do other work which exists in the national economy.  Parra,

481 F.3d at 746.  He can satisfy this burden by referring to the Medical-Vocational Guidelines

("grids"), 20 CFR Part 404, Subpart P, Appendix 2, or by eliciting the testimony of a VE with a

hypothetical question that accurately reflects all the limitations of the claimant.  Tackett v. Apfel,

180 F.3d 1094, 1101 (9th Cir. 1999).  Here, the ALJ relied on the grids to conclude that, given

Sigman's ability to perform a full range of work at all exertional levels, but with the limitation of

working in team or tandem, or around the general public, there are jobs in the national economy

that Sigman could perform.

The grids are used to determine if substantial gainful work exists for claimants with

substantially uniform levels of impairment.  When the grids do not adequately take into account a

claimant's abilities and limitations, however, they may be used only as a framework and a

vocational expert must be consulted.  Thomas v. Barnhart, 278 F.3d 947, 960 (9th Cir. 2002).

Indeed, if the nonexertional limitations are severe enough to limit the range of work at the

exertional level, the grids do not apply and a vocational expert must identify specific jobs within

the claimant's abilities.  Polny v. Bowen, 864 F.2d 661, 663-64 (9th Cir. 1988).

Here, the ALJ conceded that Sigman's ability to perform work was compromised by his

nonexertional limitations.  However, the ALJ found that "these limitations have little or no effect

on the occupational base of unskilled work at all exertional levels."  Tr. 40.

It is true that unskilled work is defined to mean "dealing primarily with objects, rather

than data or people," which might have accounted for Sigman's limitation on working around the

general public.  SSR 85-15.  However, unskilled work also requires the ability to "respond

appropriately to supervision, coworkers, and usual work situations[.]"  Id.  A "substantial loss of

ability" to meet this expectation "would severely limit the potential occupational base."  Id.  It is

unclear, then, how much Sigman's limitation on working in teams or in tandem might erode the

unskilled work base.  If, as the Commissioner argues, the ALJ did not believe these

nonexertional impairments were "sufficiently severe" because of Sigman's social skills, he was

required to explain his thinking.  See Stout, 454 F.3d at 1054 (the court cannot "affirm the

decision of an agency on a ground that the agency did not invoke in making its decision").

Further, since the ALJ neglected to consider Sigman's intellectual limitations, combined

with the possibility that the ALJ may find exertional limitations as identified by the lay

witnesses, I am required to find that the ALJ should not have relied exclusively on the grids.  As

PAGE 16 - OPINION AND ORDER

in Polny, where the claimant was limited to jobs that were not highly stressful, did not require

complex instructions, and did not require dealing with the public, the limitations are "in

themselves enough to limit [the claimant's] range of work" making the grids inapplicable.  864

F.2d at 663.  Instead, the testimony of a vocational expert was required.

**CONCLUSION**

For the foregoing reasons, the decision of the Commissioner is reversed.  This action is

remanded to the Commissioner under sentence four of 42 U.S.C. § 405(g) for (1) reevaluation of

the lay witness testimony; (2) reevaluation of Sigman's residual functional capacity; and (3) to

obtain testimony from a vocational expert about what work, if any, Sigman could perform.

Judgment will be entered.

IT IS SO ORDERED.


Dated this _____17th_____ day of June, 2011.



    /s/ Garr M. King_____
    Garr M. King
    United States District Judge

PAGE 17 - OPINION AND ORDER